**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**Case No.: _____**

GOVERNMENT EMPLOYEES
INSURANCE CO., GEICO
INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO
CASUALTY CO.,

       Plaintiffs,

vs.

CRESPO & ASSOCIATES, P.A. and
LUIS E. CRESPO, M.D.,

       Defendants.

**Jury Trial Demand**

_____/

## **COMPLAINT**

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co.,
GEICO General Insurance Company, and GEICO Casualty Co. (collectively
"GEICO" or "Plaintiffs"), sue Defendants and allege as follows.

1.    This action seeks to recover more than $3,000,000.00 that Defendants
wrongfully obtained from GEICO by submitting thousands of fraudulent and
unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance
charges through Defendant Crespo & Associates, P.A. ("Crespo & Associates")

relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services and goods, including purported examinations, physical therapy services, magnetic resonance imaging ("MRI"), pain fiber nerve conduction study tests ("pf-NCS"), and durable medical equipment ("DME")(collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO PIP insurance policies.

2.     In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent, and unlawful PIP claims that Defendants have submitted through Crespo & Associates, because:

(i)     the Defendants operated in pervasive violation of Florida law, including: (a) the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"); (b) Florida's false and fraudulent insurance claims statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"); (c) Florida's Physical Therapy Practice Act, Fla. Stat. § 486.011-486.172 ("the Physical Therapy Act"); and (d) Florida's Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law"), thereby rendering them ineligible to collect PIP insurance benefits in the first instance, and rendering their PIP insurance charges noncompensable and unenforceable;

(ii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)   in many cases, the Fraudulent Services never were legitimately provided in the first instance;

(iv)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently and unlawfully inflate the charges submitted to GEICO; and

(v)   the Defendants unlawfully billed GEICO for "physical therapy" services performed by massage therapists.

3.   As set forth below, the Defendants at all relevant times have known that:

(i)   the Defendants operated in pervasive violation of Florida law, including: (a) the licensing and operating requirements set forth in the Clinic Act; (b) the False and Fraudulent Insurance Claims Statute; (c) the Physical Therapy Act; and (d) the No-Fault Law, thereby rendering them ineligible to collect PIP insurance benefits in the first instance, and rendering their PIP insurance charges noncompensable and unenforceable;

(ii)   the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)   in many cases, the Fraudulent Services never were legitimately performed in the first instance;

(iv)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO; and

(v)   the purported physical therapy services billed through Crespo & Associates to GEICO were performed by massage therapists, and therefore were ineligible for PIP insurance reimbursement in the first instance.

4.     As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO.

5.     The chart attached hereto as Exhibit "1" sets forth a large and representative sample of the fraudulent and unlawful claims that have been identified to date that have been submitted through Crespo & Associates to GEICO by mail.

6.     The Defendants' fraudulent and unlawful scheme began no later than 2018, and has continued uninterrupted since that time. As a result of Defendant's fraudulent and unlawful scheme, GEICO has incurred damages of more than $3,000,000.00.

## THE PARTIES

### I.    Plaintiffs

7.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.   Defendants

8.     Defendant Crespo resides in and is a citizen of Florida. Crespo was licensed to practice medicine in Florida on June 26, 1985. Crespo owned and

controlled Crespo & Associates, falsely purported to supervise the business activities at Crespo & Associates, and used Crespo & Associates as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

9.      Defendant Crespo & Associates is a Florida professional corporation with its principal place of business in Florida. Crespo & Associates was incorporated in Florida on January 28, 1998, had Crespo as its owner and president, operated in violation of the Clinic Act, False and Fraudulent Insurance Claims Statute, and Physical Therapy Act, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

## III.   **Judith Dano, A.P.R.N.**

10.     Although GEICO does not currently name her as a Defendant in this action, Judith Dano, A.P.R.N. ("Dano") is relevant to understanding Plaintiffs' claims in this action.

11.     Dano is an advanced practice registered nurse, was employed by or associated with Crespo & Associates, and purported to perform many of the Fraudulent Services on behalf of Crespo & Associates at the Defendants' direction.

## **JURISDICTION AND VENUE**

12.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of

interests and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

13.    This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

14.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

15.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

## I.    Brief Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

### A.    The Florida No-Fault Law

16.    Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the No-Fault Law, which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

17.    Under the No-Fault Law, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. See Fla.

Stat. § 627.736. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form"). See id.

**B.    No-Fault Reimbursement and Compliance with Florida Law Governing Health Care Practice**

18.    In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

19.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

20.    Thus, health care services providers may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment – including, among other things, the Clinic Act, the Physical Therapy Act, the No-Fault Law, and the False and Fraudulent Insurance Claims statute.

21.    By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in

substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

**C.   No-Fault Reimbursement and Compliance with the False and Fraudulent Insurance Claims Statute**

22.   Under the False and Fraudulent Insurance Claims statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from PIP patients. See Fla. Stat. § 817.234(7).

23.   Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

**D.   No-Fault Reimbursement and Compliance with the Clinic Act**

24.   Pursuant to the Clinic Act, and subject to certain limited exceptions, a clinic license issued by the Florida Agency for Health Care Administration is required in order to operate a health care practice in Florida. <u>See</u> Fla. Stat. § 400.991(1)(a).

25.   However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . <u>that is wholly owned by one or more licensed health care practitioners</u>, or the

licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner <u>if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws.</u>

Fla. Stat. § 400.9905(4)(g)(emphasis added).

26.    In order for a health care practice to qualify for the "wholly owned" exemption under the Clinic Act, the licensed health care practitioner who owns the practice has a continuing obligation to supervise the business activities of the practice and remain legally responsible for the practice's compliance with all federal and state laws. Any failure to fulfill these requirements automatically voids a practice's exemption. <u>See</u> 59A-33.006(14), F.A.C.

27.    Pursuant to the Clinic Act, a health care practice operating in Florida without a valid exemption from the health care clinic licensing requirements must – among other things – obtain a clinic license and appoint a physician as medical director who must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful", and take immediate corrective action upon discovery of a fraudulent or unlawful charge. <u>See</u> Fla. Stat. § 400.9935(1).  In addition, a clinic medical director must "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." <u>See</u> Fla. Stat. § 400.9935(1).

28.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge" and is ineligible for payment. See Fla. Stat. § 400.9935(3).

**E.     No-Fault Reimbursement, Massage Therapy, Massage Therapists, and Physical Therapy**

29.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

30.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services performed by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5)("Medical benefits [that are reimbursable under the No-Fault Law] do not include massage …, regardless of the person, entity, or licensee providing massage …, and a licensed massage therapist … may not be reimbursed for medical benefits under this section.")

31.     The No-Fault Law was amended to prohibit PIP reimbursement for massage or for services performed by massage therapists in response to widespread

PIP fraud involving massage services and massage therapists. See, e.g., Florida House of Representatives Staff Analysis for House Bill 119 (amending the No-Fault Law), noting that "PIP fraud remains rampant", and citing dramatic increases in PIP claims for massage therapy as a significant part of the problem.

32.     Pursuant to the Physical Therapy Act, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

33.     Health care practices in Florida may not collect PIP Benefits for any services performed by massage therapists, or for physical therapy services that are performed by unlicensed individuals.

**F.      No-Fault Reimbursement and Medical Necessity**

34.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. See Fla. Stat. § 627.736. At the same time, a health care services provider, including a clinic licensed under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services. Id.

35.     Pursuant to the No-Fault Law, "medically necessary" means:

> a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a) In accordance with generally accepted standards of medical practice;

(b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c) Not primarily for the convenience of the patient, physician, or other health care provider.

See Fla. Stat. § 627.732.

**G.    No-Fault Billing and No-Fault Reimbursement**

36.    Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)    for any service or treatment that was not lawful at the time rendered;

(ii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges;

(iii)    for any treatment or service that is upcoded; or

(iv)    with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

See Fla. Stat. § 627.736.

37.    The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes. See Fla. Stat. § 627.736.

12

38.     By listing a health care practitioner in Box 31 of a HCFA-1500 form, the billing provider represents that the practitioner performed or directly supervised the underlying services, and "[t]o directly supervise, a doctor must be physically present at the facility". See Medicare Claims Processing Manual, Chapter 26, Item 31.

39.     Additionally, in order for a health care service to be eligible for PIP reimbursement, the applicable claim form must set forth the professional license number of the provider who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials." See Fla. Stat. § 627.736.

40.     Health care providers may not receive PIP Benefits if they bill for unlawful or upcoded services, knowingly submit false or misleading billing or treatment reports, or misrepresent, in their billing, the identities of the individuals who performed or directly supervised the underlying services.

**II.     The Defendants' Fraudulent and Unlawful Scheme**

41.     Since at least 2018, and continuing through the present day, the Defendants devised and implemented a fraudulent and unlawful scheme pursuant to which they billed GEICO millions of dollars for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable services.

**A.     The Defendants' Violations of the Clinic Act**

13

42.     As part of the Defendants' fraudulent and unlawful scheme, Crespo operated Crespo & Associates in pervasive violation of the Clinic Act.

43.     Crespo & Associates was a "clinic" within the meaning of the Clinic Act, in that it was an entity "where health care services [were] provided to individuals and which tender[ed] charges for reimbursement for services."

44.     However, Crespo & Associates never had a clinic license or medical director.

45.     Instead, Crespo & Associates was – at all times – owned by Crespo, and purported to operate under the "wholly owned" exemption from the Clinic Act's licensing, operating, and medical director requirements.

46.     However, Crespo never legitimately supervised the business activities of Crespo & Associates, inasmuch as Crespo never conducted legitimate reviews of the billing or treatment records from Crespo & Associates to ensure that the billing was not fraudulent or unlawful, never ensured that all health care practitioners at Crespo & Associates had active appropriate certification or licensure for the level of care being provided, and never made any attempt to remedy the fraudulent and unlawful charges submitted through Crespo & Associates, as described herein.

47.     To the contrary, Crespo directed and participated in the fraudulent and unlawful scheme described herein.

14

48.    Accordingly, at all relevant times Crespo & Associates operated in violation of the Clinic Act.

49.    In the claims identified in Exhibit "1", the Defendants' PIP charges were fraudulent and unlawful in that they misrepresented that Crespo & Associates was compliant with Florida law and eligible to receive PIP reimbursement in the first instance.

50.    In fact, Crespo & Associates never was compliant with Florida law or eligible to receive PIP reimbursement, because it operated in pervasive violation of the Clinic Act.

**B.    The Defendants' Unlawful Billing for Physical Therapy Services Performed by Massage Therapists, and Misrepresentations Regarding the Identity of the Treating Practitioners**

51.    What is more, and in keeping with the fact that Crespo did not legitimately supervise the business activities of Crespo & Associates, the purported "physical therapy" services in the claims identified in Exhibit "1" were unlawfully performed – the extent they were performed at all – by massage therapists.

52.    Upon information and belief based on publicly-available information, including database searches, the massage therapists who performed the purported "physical therapy" services at Crespo & Associates included, but were not limited to, individuals named Denise Lozada, Kayla McBride, Karen Nicotra, and Dawn Davis, among others.

53.    The No-Fault Law and the Florida Physical Therapy Act prohibited Crespo & Associates from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by massage therapists.

54.    The Defendants were aware of the fact that Crespo & Associates could not legally recover PIP Benefits for services performed by massage therapists.

55.    For example, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

56.    Accordingly, in the claims for physical therapy services identified in Exhibit "1", in an attempt to conceal the fact that the "physical therapy" services provided by Crespo & Associates had been performed by massage therapists, and make it appear as if the services were eligible for PIP reimbursement, the Defendants: (i) virtually always falsely represented, in Box 31 of the HCFA-1500 forms that they used to bill for the services, that a physician associated with Crespo & Associates, usually Crespo himself, performed or at least directly supervised the services; and (ii) did not include the name or license number of the massage therapists on the HCFA-1500 forms they used to bill for the services, despite the

fact that the massage therapists associated with Crespo & Associates were the individuals who purported to perform the "physical therapy" services.

57.     In fact, not only did the massage therapists associated with Crespo & Associates routinely unlawfully perform the physical therapy services billed through Crespo & Associates to GEICO, but they did so without any legitimate supervision by Crespo.

58.     In keeping with the fact that Crespo did not legitimately perform or directly supervise the purported physical therapy services provided by Crespo & Associates, the "physical therapy" services that were billed through Crespo & Associates were medically unnecessary, inasmuch as the Insureds were given a substantially-identical physical therapy treatment plan at Crespo & Associates, which was not tailored to each individual patient's individual circumstances, presentation, and symptomatology, which in turn is at odds with the standard of care for physical or rehabilitative medicine.

59.     What is more, and also in keeping with the fact that Crespo did not legitimately perform or directly supervise the "physical therapy" services that were billed through Crespo & Associates to GEICO, the Defendants routinely falsely represented, in the billing they submitted or caused to be submitted through Crespo & Associates to GEICO for physical therapy services, between 2018 and the

present, that Crespo personally performed or supervised a non-credible number of physical therapy services on individual dates.

60.   For instance:

(i)   On August 30, 2018, Crespo & Associates and Crespo purported to provide at least 65 individual physical therapy services to at least 13 individual Insureds, and falsely contended in the resulting bills to GEICO that Crespo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 16.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Crespo also purported to personally perform, or at least directly supervise, four 25-minute examinations that were performed on at least 4 individual Insureds. In all, GEICO received billing for at least 17.75 hours of services that Crespo purported to personally perform, or at least directly supervise, on August 30, 2018.

(ii)  On January 15, 2019, Crespo & Associates and Crespo purported to provide at least 86 individual physical therapy services to at least 16 individual Insureds, and falsely contended in the resulting bills to GEICO that Crespo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 21.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Crespo also purported to personally perform, or at least directly supervise, five 25-minute examinations that were performed on at least 5 individual Insureds. In all, GEICO received billing for at least 23.5 hours of services that Crespo purported to personally perform, or at least directly supervise, on January 15, 2019.

(iii) On August 21, 2019, Crespo & Associates and Crespo purported to provide at least 76 individual physical therapy services to at least 13 individual Insureds, and falsely contended in the resulting bills to GEICO that Crespo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 19 hours of physical therapy services that

required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Crespo also purported to personally perform, or at least directly supervise, four 25-minute examinations that were performed on at least 4 individual Insureds. In all, GEICO received billing for at least 20.5 hours of services that Crespo purported to personally perform, or at least directly supervise, on August 21, 2019.

(iv)     On November 12, 2019, Crespo & Associates and Crespo purported to provide at least 82 individual physical therapy services to at least 15 individual Insureds, and falsely contended in the resulting bills to GEICO that Crespo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 20.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Crespo also purported to personally perform, or at least directly supervise, five 25-minute examinations that were performed on at least 5 individual Insureds. In all, GEICO received billing for at least 22.5 hours of services that Crespo purported to personally perform, or at least directly supervise, on November 12, 2019.

(v)     On January 21, 2020, Crespo & Associates and Crespo purported to provide at least 51 individual physical therapy services to at least 9 individual Insureds, and falsely contended in the resulting bills to GEICO that Crespo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 12.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Crespo also purported to personally perform, or at least directly supervise, (a) five 25-minute examinations that were performed on at least 5 individual Insureds, and (b) one 45-minute new patient examination. In all, GEICO received billing for at least 15.5 hours of services that Crespo purported to personally perform, or at least directly supervise, on January 21, 2020.

(vi)     On August 4, 2020, Crespo & Associates and Crespo purported to provide at least 60 individual physical therapy services to at least 11 individual Insureds and falsely contended in the resulting bills to

GEICO that Crespo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 15 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Crespo also purported to personally perform, or at least directly supervise, (a) two 25-minute examinations that were performed on at least 2 Insureds, and (b) one 45-minute new patient examination. In all, GEICO received billing for at least 16.5 hours of services that Crespo purported to personally perform, or at least directly supervise, on August 4, 2020.

(vii)   On July 29, 2021, Crespo & Associates and Crespo purported to provide at least 62 individual physical therapy services to at least 10 individual Insureds and falsely contended in the resulting bills to GEICO that Crespo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 15.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Crespo also purported to personally perform, or at least directly supervise, 5 thirty-minute examinations that were performed on at least 5 Insureds. In all, GEICO received billing for at least 18 hours of services that Crespo purported to personally perform, or at least directly supervise, on July 29, 2021.

(viii)  On February 1, 2022, Crespo & Associates and Crespo purported to provide at least 46 individual physical therapy services to at least 7 individual Insureds and falsely contended in the resulting bills to GEICO that Crespo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Crespo also purported to personally perform, or at least directly supervise, (a) three 30-minute examinations to three Insureds, and (b) three 45-minute new patient examinations to an additional Insured. In all, GEICO received billing for at least 15.25 hours of services that Crespo purported to personally perform, or at least directly supervise, on February 1, 2022.

(ix)   On May 26, 2022, Crespo & Associates and Crespo purported to provide at least 68 individual physical therapy services to at least 13 individual Insureds and falsely contended in the resulting bills to GEICO that Crespo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 17 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Crespo also purported to personally perform, or at least directly supervise two 30-minute examinations and one 40-minute examination to three Insureds. In all, GEICO received billing for at least 18.5 hours of services that Crespo purported to personally perform, or at least directly supervise, on May 26, 2022.

(x)   On June 13, 2022, Crespo & Associates and Crespo purported to provide at least 57 individual physical therapy services to at least 10 individual Insureds and falsely contended in the resulting bills to GEICO that Crespo personally performed or at least directly supervised every one of those treatments. What is more those, putative treatments included at least 14.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Crespo also purported to personally perform, or at least directly supervise, three 30-minute examinations to three Insureds. In all, GEICO received billing for at least 15.75 hours of services that Crespo purported to personally perform, or at least directly supervise, on June 13, 2022.

61.   These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "1", the Defendants routinely falsely that Crespo had performed – or at least directly supervised – an improbable number of physical therapy services on individual dates.

62.   Furthermore, upon information and belief, the fraudulent and unlawful billing for physical therapy services that the Defendants submitted through Crespo

& Associates to GEICO constituted only a fraction of the total fraudulent and unlawful billing for physical therapy services that the Defendants submitted through Crespo & Associates to all of the automobile insurers in the Florida automobile insurance market.

63.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

64.    It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent and unlawful billing to GEICO, and that the Defendants did not simultaneously bill other automobile insurers.

65.    Thus, upon information and belief, the non-credible number of physical therapy services that Crespo purported to perform or directly supervise for GEICO Insureds at Crespo & Associates on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of physical therapy services that Crespo purported to directly supervise or provide at Crespo & Associates, including to individuals insured by companies other than GEICO, on those same dates of service.

66.    In the claims for physical therapy services identified in Exhibit "1", the Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the purported physical therapy services were performed – to the extent that they were performed at all – by massage therapists, in contravention of Florida law;

(ii)    the Defendants could not lawfully recover PIP Benefits for the purported physical therapy services, because they were performed by massage therapists; and

(iii)   the Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative physical therapy services.

67.    In this context, Crespo – who at all relevant times purported to own Crespo & Associates – did not, and could not have, legitimately supervised the business activities of Crespo & Associates.

68.    Had Crespo legitimately supervised the business activities of Crespo & Associates, Crespo would have noted – among other things – that the physical therapy services were unlawfully performed by massage therapists, and unlawfully billed to GEICO.

69.    Crespo failed to do so because he never legitimately supervised the business activities of Crespo & Associates.

**C.    The Defendants' Unlawful General Business Practice of Failing to Make a Good Faith Effort to Collect Co-Payments or Deductibles from Their Patients**

70.    During the relevant time period, the Defendants unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to

collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

71.    In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-1500 forms) submitted through Crespo & Associates to GEICO for the Defendants' Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a copayment or deductible, from the patients.

72.    In the claims identified in Exhibit "1", the Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because the Defendants engaged in the unlawful general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

73.    In this context, Crespo – who at all relevant times purported to own Crespo & Associates – did not, and could not have, legitimately supervised the business activities of Crespo & Associates.

74.    Had Crespo legitimately supervised the business activities of Crespo & Associates, Crespo would have ensured – among other things – that Crespo & Associates complied with the False and Fraudulent Insurance Claims Statute.

75.    Crespo failed to do so because he never legitimately supervised the business activities of Crespo & Associates.

**D.    The Defendants' Fraudulent Treatment and Billing Protocol**

76.    In the claims identified in Exhibit "1", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced.

77.    Even so, in the claims identified in Exhibit "1", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined fraudulent protocol designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the "treatment".

78.    The Defendants purported to provide their pre-determined fraudulent treatment protocol to the Insureds in the claims identified in Exhibit "1" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual continuing medical problem arising from any actual automobile accidents.

79.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false

justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

80.    No legitimate physician or health care practice would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

81.    The Defendants permitted the fraudulent treatment and billing protocol designed below to proceed under their auspices because: (i) Crespo & Associates was, at all relevant times, operating in violation of the Clinic Act, without legitimate oversight by Crespo; and (ii) the Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

## 1.    General Requirements for Patient Examinations Billed Under CPT Codes 99204 and 99214

82.    As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of current procedural terminology, or CPT codes. See Fla. Stat. § 627.736.

83.    The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

## (i)    CPT Code 99204

84.     Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination typically represents that the patient presented with problems of moderate to high severity.

85.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 for an initial patient examination.

86.     For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

87.     Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to a patient's health, or even the patient's life.

88.     Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

89.     Additionally, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

**(ii)    CPT Code 99214**

90.     Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient presented with problems of moderate to high severity.

91.     The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of moderate to high severity, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

28

92.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of moderate to high severity, and therefore support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)    Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)    Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)    Office evaluation on new onset RLQ pain in a 32-year-old-woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)    Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing

procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

93.    Accordingly, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

94.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represents that the examining physician performed at least two of the following three components in connection with the examination: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision making of "moderate complexity".

## 2.    The Fraudulent Charges for Initial Examinations at Crespo & Associates

95.    As an initial step in Defendants' fraudulent scheme, the Defendants purported to provide virtually all of the Insureds in the claims identified in Exhibit "1" with an initial examination.

96.    As set forth in Exhibit "1", the vast majority of initial examinations – usually performed by Crespo or Dano – were then billed by the Defendants through Crespo & Associates to GEICO under CPT code 99204, typically resulting in a charge between $450.00 and $525.00 for each putative examination.

97.    In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Crespo & Associates' eligibility to collect PIP Benefits in the first instance.

30

98.    In fact, and as set forth herein, Crespo & Associates never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act.

99.    As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**(i)    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

100.   In the claims for initial examinations identified in Exhibit "1", Crespo & Associates and Crespo routinely misrepresented the severity of the Insureds' presenting problems.

101.   Pursuant to the CPT Assistant, the use of CPT code 99204 for an initial examination typically required that the Insured present with problems of moderate to high severity.

102.   However, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as a result of their typically-minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

103.   For instance, in most of the claims identified in Exhibit "1", the Insureds did not seek treatment at any hospital as a result of their accident, and to

the limited extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then discharged with nothing more serious than a minor soft tissue diagnosis.

104.    Furthermore, in most of the claims identified in Exhibit "1", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents, or injured at all.

105.    Even so, in the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely represented that the Insureds presented with problems of moderate or high severity.

106.    For example:

(i)     On September 5, 2019, an Insured named AW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AW's vehicle was drivable following the accident. The police report further indicated that AW was not injured and did not complain of any pain at the scene. In keeping with the fact that AW was not seriously injured, AW did not visit any hospital emergency room following the accident. To the extent that AW experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AW on September 11, 2019, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)  On October 2, 2020, an Insured named CS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CS's vehicle was drivable following the accident. The police report further indicated that CS was not injured and did not complain of any pain at the scene. In keeping with the fact that CS was not seriously injured, CS did not visit any hospital emergency room following the accident. To the extent that CS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CS on October 8, 2020, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)  On February 1, 2021, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured and did not complain of any pain at the scene. In keeping with the fact that AG was not seriously injured, AG did not visit any hospital emergency room following the accident. To the extent that AG experienced any health issues at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AG on February 12, 2021, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)  On August 16, 2021, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CM on August

17, 2021, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)     On September 2, 2021, an Insured named SW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SW's vehicle was drivable following the accident. The police report further indicated that SW was not injured and did not complain of any pain at the scene. In keeping with the fact that SW was not seriously injured, SW did not visit any hospital emergency room following the accident. To the extent that SW experienced any health issues at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of SW on September 7, 2021, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)    On December 7, 2021, an Insured named DA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DA's vehicle was drivable following the incident. The police report further indicated that DA was not injured and did not complain of any pain at the scene. In keeping with the fact that DA was not seriously injured, DA did not visit any hospital emergency room following the accident. To the extent that DA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of DA on December 10, 2019, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)   On February 11, 2022, an Insured named PK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PK's vehicle was drivable following the accident. The police report further indicated that PK was not injured and did not complain of any pain at

the scene. In keeping with the fact that PK was not seriously injured, PK did not visit any hospital emergency room following the accident. To the extent that PK experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of PK on February 15, 2022, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)   On August 13, 2022, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AM on August 23, 2022, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)   On August 31, 2022, an Insured named NP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that NP's vehicle was drivable following the accident. The police report further indicated that NP was not injured and did not complain of any pain at the scene. In keeping with the fact that NP was not seriously injured, NP did not visit any hospital emergency room following the accident. To the extent that NP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of NP on September 2, 2022, Crespo & Associates, Crespo, and Dano billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)     On October 27, 2022, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured and did not complain of any pain at the scene. In keeping with the fact that LS was not seriously injured, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LS on October 31, 2022, Crespo & Associates, Crespo, and Dano billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xi)    On June 12, 2023, an Insured named CH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CH's vehicle was drivable following the accident. The police report further indicated that CH was not injured and did not complain of any pain at the scene. In keeping with the fact that CH was not seriously injured, CH did not visit any hospital emergency room following the accident. To the extent that CH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CH on June 16, 2023, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xii)   On August 1, 2023, an Insured named LG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LG's vehicle was drivable following the accident. The police report further indicated that LG was not injured and did not complain of any pain at the scene. In keeping with the fact that LG was not seriously injured, LG did not visit any hospital emergency room following the accident. To the extent that LG experienced any health issues at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LG on August 10, 2023, Crespo &

36

Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiii)  On August 30, 2023, an Insured named KH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KH's vehicle was drivable following the accident. The police report further indicated that KH was not injured and did not complain of any pain at the scene. In keeping with the fact that KH was not seriously injured, KH did not visit any hospital emergency room following the accident. To the extent that KH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of KH on September 11, 2023, Crespo & Associates, Crespo, and Dano billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problem of moderate to high severity.

(xiv)  On December 1, 2023, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health issues at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JP on December 12, 2023, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv)  On January 10, 2024, an Insured named RG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RG's vehicle was drivable following the accident. The police report further indicated that RG was not injured and did not complain of any pain at

the scene. In keeping with the fact that RG was not seriously injured, RG did not visit any hospital emergency room following the accident. To the extent that RG experienced any health issues at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of RG on January 16, 2024, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

107.   These are only representative examples. In the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide the Insureds.

108.   In this context, Crespo, who at all relevant times purported to own Crespo & Associates did not – and could not have – legitimately supervised the business activities of Crespo & Associates.

109.   Had Crespo legitimately supervised the business activities of Crespo & Associates, he would have ensured – among other things – that Crespo & Associates' billing accurately represented the severity of the Insureds' presenting problems.

110.   Crespo failed to do so because he never legitimately supervised the business activities of Crespo & Associates.

**(ii)   Misrepresentations Regarding the Amount of Time Spent on Initial Examinations**

111.   What is more, in the claims identified in Exhibit "1", the charges for the initial examinations under CPT code 99204 misrepresented and exaggerated the amount of face-to-face time that the examining practitioner, typically Crespo or Dano, spent with the Insured or the Insureds' families during the examinations.

112.   As set forth in Exhibit "1", the Defendants typically billed for their putative initial examinations using CPT code 99204, and thereby represented that the practitioner who purported to conduct the examinations – usually Crespo or Dano – spent at least 45 minutes of face-to-face time with the Insureds or their families during the examinations.

113.   In fact, in the initial examinations identified in Exhibit "1", neither Crespo, Dano, nor any other health care practitioner at Crespo & Associates, spent more than 15-20 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 45 minutes.

114.   In keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not involve more than 15-20 minutes of face-to-face time with the Insureds, or the Insureds' families, to the extent that they were

provided at all, Crespo and Dano used template forms in conducting the examinations.

115.   All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

116.   These interviews and examinations did not require Crespo, Dano, or any other health care practitioner to spend more than 15-20 minutes of face-to-face time with the Insureds during the putative initial examinations.

117.   In the claims for initial examinations that are identified in Exhibit "1", the Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99204 are reimbursable at higher rates than examinations that take less time to perform.

**(iii)    Misrepresentations Regarding the Extent of Medical Decision-Making**

118.   Moreover, and pursuant to the CPT Assistant, in the claims for initial examinations identified in Exhibit "1", when the Defendants billed GEICO for putative initial examinations under CPT code 99204, they falsely represented that the physicians and other health care practitioners who purported to perform the examinations on behalf of Crespo & Associates engaged in some legitimate,

moderate complexity medical decision-making in connection with the examinations.

119.   In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

120.   Rather, in the claims for initial examinations identified in Exhibit "1", (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic, tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) the physicians and other health care practitioners who purported to perform the examinations on behalf of Crespo & Associates did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

121.   Rather, to the extent that the initial examinations were conducted in the first instance, the Defendants provided a substantially similar, pre-determined "diagnosis" for every Insured, and prescribed a substantially similar course of treatment for every Insured, regardless of their actual individual circumstances.

122.   For example:

(i)      On September 24, 2019, an Insured named AW was involved in an automobile accident. The contemporaneous police report indicated

that AW was not seriously injured during the accident. In keeping with the fact that AW was not seriously injured, AW did not travel to any hospital emergency room following the accident. To the extent that AW experienced any health problems as result of the accident, they were of low or minimal severity. Even so, on September 24, 2019, Crespo & Associates and Crespo purported to provide an initial examination to AW – which purportedly was performed by Dano. Dano did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Dano did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Crespo & Associates, Crespo, and Dano provided AW with substantially the same list of soft tissue injury "diagnoses" that Crespo & Associates and Crespo provided virtually every other Insured. Furthermore, neither AW's presenting problems, nor the treatment plan provided to AW by Crespo & Associates and Crespo presented any risk of significant complications, morbidity, or mortality. To the contrary, AW did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Crespo & Associates and Crespo consisted of medically unnecessary physical therapy treatment, which did not pose any risk to AW if properly administered.  Even so, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Dano engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)     On October 2, 2020, an Insured named CS was involved in an automobile accident. The contemporaneous police report indicated that CS was not seriously injured during the accident. In keeping with the fact that CS was not seriously injured, CS did not travel to any hospital emergency room following the accident. To the extent that CS experienced any health problems as a result of the accident, they were of low or minimal severity. Even so, on October 8, 2020, Crespo & Associates and Crespo purported to provide an initial examination to CS – which purportedly was performed by Crespo. Crespo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Crespo did not consider any significant number of diagnoses or management options in connection with the

examination. Instead, Crespo & Associates and Crespo provided CS with substantially the same false list of soft tissue injury "diagnoses" that Crespo & Associates and Crespo provided virtually every other Insured. Furthermore, neither CS's presenting problems, nor the treatment plan provided to CS by Crespo & Associates and Crespo presented any risk of significant complications, morbidity, or mortality. To the contrary, CS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Crespo & Associates and Crespo consisted of medically unnecessary physical therapy treatment, which did not pose any risk to CS if properly administered. Even so, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Crespo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii) On February 1, 2021, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that AG was not seriously injured during the accident. In keeping with the fact that AG was not seriously injured, AG did not travel to any hospital emergency room following the accident. To the extent that AG experienced any health problems as a result of the accident, they were of low or minimal severity. Even so, on February 12, 2021, Crespo & Associates and Crespo purported to provide an initial examination to AG – which purportedly was performed by Dano. Dano did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Dano did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Crespo & Associates, Crespo, and Dano provided AG with substantially the same false list of soft tissue injury "diagnoses" that Crespo & Associates and Crespo provided virtually every other Insured. Furthermore, neither AG's presenting problems, nor the treatment plan provided to AG by Crespo & Associates, Crespo, and Dano presented any risk of significant complications, morbidity, or mortality. To the contrary, AG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Crespo & Associates, Crespo, and Dano consisted of medically unnecessary physical therapy treatment, which did not pose any risk to AG if properly administered. Even so, Crespo

43

& Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Dano engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)    On August 16, 2021, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that CM was not seriously injured during the accident. In keeping with the fact that CM was not seriously injured, CM did not travel to any hospital emergency room following the accident. To the extent that CM experienced any health problems as a result of the accident, they were of low or minimal severity. Even so, on August 17, 2021, Crespo & Associates and Crespo purported to provide an initial examination to CM – which purportedly was performed by Crespo. Crespo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Crespo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Crespo & Associates and Crespo provided CM with substantially the same false list of soft tissue injury "diagnoses" that Crespo & Associates and Crespo provided virtually every other Insured. Furthermore, neither CM's presenting problems, nor the treatment plan provided to CM by Crespo & Associates and Crespo presented any risk of significant complications, morbidity, or mortality. To the contrary, CM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Crespo & Associates and Crespo consisted of medically unnecessary physical therapy treatment, which did not pose any risk to CM if properly administered. Even so, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Crespo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)    On December 7, 2021, an Insured named DA was involved in an automobile accident. The contemporaneous police report indicated that DA was not seriously injured during the accident. In keeping with the fact that DA was not seriously injured, DA did not travel to any hospital emergency room following the accident. To the extent that DA experienced any health problems as a result of the accident, they

were of low or minimal severity. Even so, on December 10, 2021, Crespo & Associates and Crespo purported to provide an initial examination to DA – which purportedly was performed by Dano. Dano did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Dano did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Crespo & Associates, Crespo, and Dano provided DA with substantially the same false list of soft tissue injury "diagnoses" that Crespo & Associates and Crespo provided virtually every other Insured. Furthermore, neither DA's presenting problems, nor the treatment plan provided to DA by Crespo & Associates, Crespo, and Dano presented any risk of significant complications, morbidity, or mortality. To the contrary, DA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Crespo & Associates, Crespo, and Dano consisted of medically unnecessary physical therapy treatment, which did not pose any risk to DA if properly administered. Even so, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Crespo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)   On February 11, 2022, an Insured named PK was involved in an automobile accident. The contemporaneous police report indicated that PK was not seriously injured during the accident. In keeping with the fact that PK was not seriously injured, PK did not travel to any hospital emergency room following the accident. To the extent that PK experienced any health problems as a result of the accident, they were of low or minimal severity. Even so, on February 15, 2022, Crespo & Associates and Crespo purported to provide an initial examination to PK – which purportedly was performed by Crespo. Crespo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Crespo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Crespo & Associates and Crespo provided PK with substantially the same false list of soft tissue injury "diagnoses" that Crespo & Associates and Crespo provided virtually every other Insured. Furthermore, neither PK's presenting problems,

nor the treatment plan provided to PK by Crespo & Associates and Crespo presented any risk of significant complications, morbidity, or mortality. To the contrary, PK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Crespo & Associates and Crespo consisted of medically unnecessary physical therapy treatment, which did not pose any risk to PK if properly administered. Even so, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Crespo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)   On August 31, 2022, an Insured named NP was involved in an automobile accident. The contemporaneous police report indicated that NP was not seriously injured during the accident. In keeping with the fact that NP was not seriously injured, NP did not travel to any hospital emergency room following the accident. To the extent that NP experienced any health problems as a result of the accident, they were of low or minimal severity. Even so, on September 2, 2022, Crespo & Associates and Crespo purported to provide an initial examination to NP – which purportedly was performed by Dano. Dano did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Dano did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Crespo & Associates and Crespo provided NP with substantially the same false list of soft tissue injury "diagnoses" that Crespo & Associates and Crespo provided virtually every other Insured. Furthermore, neither NP's presenting problems, nor the treatment plan provided to NP by Crespo & Associates, Crespo, and Dano presented any risk of significant complications, morbidity, or mortality. To the contrary, NP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Crespo & Associates, Crespo, and Dano consisted of medically unnecessary physical therapy treatment, which did not pose any risk to NP if properly administered. Even so, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Crespo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)  On May 8, 2023, an Insured named BR was involved in an automobile accident. The contemporaneous police report indicated that BR was not seriously injured during the accident. In keeping with the fact that BR was not seriously injured, BR did not travel to any hospital emergency room following the accident. To the extent that BR experienced any health problems as a result of the accident, they were of low or minimal severity. Even so, on May 15, 2023, Crespo & Associates and Crespo purported to provide an initial examination to BR – which purportedly was performed by Dano. Dano did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Dano did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Crespo & Associates, Crespo, and Dano provided BR with substantially the same false list of soft tissue injury "diagnoses" that Crespo & Associates and Crespo provided virtually every other Insured. Furthermore, neither BR's presenting problems, nor the treatment plan provided to BR by Crespo & Associates, Crespo, and Dano presented any risk of significant complications, morbidity, or mortality. To the contrary, BR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Crespo & Associates, Crespo, and Dano consisted of medically unnecessary physical therapy treatment, which did not pose any risk to BR if properly administered. Even so, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Dano engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)  On August 30, 2023, an Insured named KH was involved in an automobile accident. The contemporaneous police report indicated that KH was not seriously injured during the accident. In keeping with the fact that KH was not seriously injured, KH did not travel to any hospital emergency room following the accident. To the extent that KH experienced any health problems as a result of the accident, they were of low or minimal severity. Even so, on September 11, 2023, Crespo & Associates and Crespo purported to provide an initial examination to KH – which purportedly was performed by Dano. Dano did not retrieve, review, or analyze any significant amount of

medical records, diagnostic tests, or other information in connection with the examination. Moreover, Dano did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Crespo & Associates, Crespo, and Dano provided KH with substantially the same false list of soft tissue injury "diagnoses" that Crespo & Associates and Crespo provided virtually every other Insured. Furthermore, neither KH's presenting problems, nor the treatment plan provided to KH by Crespo & Associates and Crespo presented any risk of significant complications, morbidity, or mortality. To the contrary, KH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Crespo & Associates, Crespo, and Dano consisted of medically unnecessary physical therapy treatment, which did not pose any risk to KH if properly administered. Even so, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Crespo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)     On January 10, 2024, an Insured named RG was involved in an automobile accident. The contemporaneous police report indicated that RG was not seriously injured during the accident. In keeping with the fact that RG was not seriously injured, RG did not travel to any hospital emergency room following the accident. To the extent that RG experienced any health problems as a result of the accident, they were of low or minimal severity. Even so, on January 16, 2024, Crespo & Associates and Crespo purported to provide an initial examination to RG – which purportedly was performed by Crespo. Crespo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Crespo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Crespo & Associates and Crespo provided RG with substantially the same false list of soft tissue injury "diagnoses" that Crespo & Associates and Crespo provided virtually every other Insured. Furthermore, neither RG's presenting problems, nor the treatment plan provided to RG by Crespo & Associates and Crespo presented any risk of significant complications, morbidity, or mortality. To the contrary, RG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by

Crespo & Associates and Crespo consisted of medically unnecessary physical therapy treatment, which did not pose any risk to RG if properly administered. Even so, Crespo & Associates and Crespo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Crespo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

123. These are only representative examples. In the claims identified in Exhibit "1", the Defendants routinely falsely represented that the purported examinations involved legitimate moderate-complexity decision-making, when in fact they did not involve any legitimate medical decision-making.

124. In a legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprise of rest, ice, compression, and – if applicable – elevation of the affected body part.

125. It is generally inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

126. Even so, in the claims identified in Exhibit "1", the Defendants routinely directed Insureds to immediately begin a course of physical therapy often within days of their accidents, before the Insureds had first tried a more conservative course of treatment.

127.   The Defendants routinely directed Insureds to immediately begin a course of physical therapy often within days of their accidents, or even on the same day of their accidents, because their putative initial examinations involved no legitimate medical decision-making whatsoever, and had pre-determined outcomes.

128.   In keeping with the fact that these putative "diagnoses" and treatment recommendations were pre-determined and falsified, the Defendants frequently provided examinations, on or about the same date, to two or more Insureds who had been involved in the same underlying accident, and at the conclusion of the examinations, Crespo & Associates, Crespo, and Dano issued substantially identical, false "diagnoses", and recommended substantially identical courses of medically unnecessary "treatment" for the Insureds, despite the fact that they were differently situated.

129.   For example:

(i)   On November 12, 2018, three Insureds – EC, PC, and DC – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at Crespo & Associates for initial examinations by Crespo on the exact same date, November 13, 2018. At the conclusion of the purported initial examinations, Crespo & Associates and Crespo provided EC, PC, and DC with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(ii)   On May 10, 2019, two Insureds – MC and LC – were involved in the same automobile accident. Thereafter – incredibly – both Insureds

presented at Crespo & Associates for initial examinations by Dano <u>on the exact same date</u>, May 13, 2019. At the conclusion of the purported initial examinations, Crespo & Associates, Crespo, and Dano provided MC and LC with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(iii)   On August 7, 2019, two Insureds – JL and MM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Crespo & Associates for initial examinations by Crespo <u>on the exact same date</u>, August 13, 2019. At the conclusion of the purported initial examinations, Crespo & Associates and Crespo provided JL and MM with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(iv)   On December 13, 2019, two Insureds – AD and CV – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented to Crespo & Associates for initial examinations by Crespo <u>on the exact same date</u>, December 18, 2019. At the conclusion of the purported initial examinations, Crespo & Associates and Crespo provided AD and CV with substantially identical, false soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all of them.

(v)   On August 16, 2020, two Insureds – DC and TC – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented to Crespo & Associates for initial examinations by Dano <u>on the exact same date</u>, August 21, 2020. At the conclusion of the purported initial examinations, Crespo & Associates, Crespo, and Dano provided DC and TC with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(vi)   On December 24, 2020, two Insureds – SS and AS – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented to Crespo & Associates for initial examinations by Dano <u>on the exact same date</u>, December 30, 2020. At the conclusion of the purported initial examinations, Crespo & Associates, Crespo, and Dano provided SS and AS with substantially similar, false soft tissue

51

injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all of them.

(vii)   On December 4, 2021, two Insureds – IB and JB – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented to Crespo & Associates for initial examinations by Crespo on the exact same date, December 7, 2021. At the conclusion of the purported initial examinations, Crespo & Associates and Crespo provided IB and JB with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(viii)  On March 16, 2021, six Insureds – DR, JR, GA, DR, GA, and RS – were involved in the same automobile accident. Thereafter – incredibly – all six Insureds presented to Crespo & Associates for initial examinations by Crespo on the exact same date, March 16, 2021. At the conclusion of the purported initial examinations, Crespo & Associates and Crespo provided DR, JR, GA, DR, GA, and RS with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(ix)    On March 17, 2021, two Insureds – GO and DR – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented to Crespo & Associates for initial examinations by Crespo on the exact same date, March 24, 2021. At the conclusion of the purported initial examinations, Crespo & Associates and Crespo provided GO and DR with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(x)     On June 26, 2021, two Insureds – RH and VS – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented to Crespo & Associates for initial examinations by Dano on the exact same date, July 9, 2021. At the conclusion of the purported initial examinations, Crespo & Associates, Crespo, and Dano provided RH and VS with substantially similar, soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(xi)    On February 27, 2022, two Insureds – MM and NT – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented to Crespo & Associates for initial examinations by Crespo <u>on the exact same date</u>, March 3, 2022. At the conclusion of the purported initial examinations, Crespo & Associates and Crespo provided MM and NT with substantially similar, soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(xii)    On March 28, 2022, three Insureds – KE, JC, and SE – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented to Crespo & Associates for initial examinations by Crespo <u>on the exact same date</u>, March 29, 2022. At the conclusion of the purported initial examinations, Crespo & Associates and Crespo provided KE, JC, and SE with substantially similar, soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(xiii)    On June 25, 2023, two Insureds – CB and TT – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented to Crespo & Associates for initial examinations by Dano <u>on the exact same date</u>, June 30, 2023. At the conclusion of the purported initial examinations, Crespo & Associates and Crespo provided CB and TT with substantially similar, soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(xiv)    On August 30, 2023, two Insureds – KH and HM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented to Crespo & Associates for initial examinations by Dano <u>on the exact same date</u>, September 11, 2023. At the conclusion of the purported initial examinations, Crespo & Associates and Crespo provided KH and HM with substantially similar, soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(xv)    On November 29, 2023, two Insureds – DH and RP were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented to Crespo & Associates for initial examinations by Dano <u>on the exact same date</u>, December 1, 2023. At the conclusion of the

purported initial examinations, Crespo & Associates, Crespo, and Dano provided DH and RP with substantially similar, soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

130. These are only representative examples. In the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely represented that the putative examinations involved legitimate, moderate-complexity medical decision-making in order to create a false basis to bill for the initial examinations under CPT code 99204, because examinations billable under CPT codes 99204 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

131. To the extent that the Insureds in the claims identified in Exhibit "1" ever had any genuine medical problems at all as a result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back, neck, or extremities.

132. The diagnosis and treatment of these ordinary sprains and strains did not require any "moderate complexity" medical decision-making on the part of the Defendants, or any other health care practitioners associated with Crespo & Associates.

133. To the contrary, the initial examinations did not involve any legitimate medical decision-making at all, because the purported "results" of the examinations were pre-determined, falsified, and designed to provide a false

justification for the laundry-list of other Fraudulent Services that the Defendants purported to provide.

134.   In the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely represented that the initial examinations involved medical decision-making of moderate complexity in order to provide a false basis to bill for the initial examinations under CPT code 99204, because CPT codes 99204 are reimbursable at higher rates than examinations that do not require moderate complexity medical decision-making.

135.   In the claims for initial examinations identified in Exhibit "1", Crespo & Associates and Crespo routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   the Defendants never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, the No-Fault Law, and the Physical Therapy Act.

136.   In this context, Crespo, who at all relevant times purported to own Crespo & Associates, did not – and could not have – legitimately supervised the business activities of Crespo & Associates.

137.   Had Crespo legitimately supervised the business activities of Crespo & Associates, he would have noted – among other things – that Crespo & Associate's billing routinely fraudulently misrepresented that the putative initial examinations were legitimately and lawfully performed.

138.   Crespo failed to do so because he never legitimately supervised the business activities of Crespo & Associates.

**3.     The Fraudulent and Unlawful Charges for Follow-Up Examinations at Crespo & Associates**

139.   In addition to their fraudulent initial examinations, the Defendants purported to provide most of the Insureds in the claims identified in Exhibit "1" with multiple, fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

140.   In the claims identified in Exhibit "1", the follow-up examinations – which were virtually always performed by either Crespo or Dano – were then billed to GEICO, usually under CPT code 99214, typically resulting in a charge between $320.00 to $435.00 for each putative examination.

141.   In fact, and as set forth herein, Crespo & Associates never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the

Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act.

142.   As set forth below, the charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

**(i)   Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

143.   Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represented – among other things – that the patient presented with problems of moderate to high severity.

144.   However, as set forth above, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injures such as sprains and strains, which were of low or minimal severity, even at their onset.

145.   Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibit "1" presented for their putative follow-up examinations – typically weeks or months after their minor accidents – the Insureds either did not have any genuine presenting problems at all as a result of their minor automobile accidents, or else their presenting problems were minimal.

146.   Even so, in the claims for the follow-up examinations under CPT code 99214 identified in Exhibit "1", the Defendants falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

147.   For example,

(i)     On September 5, 2019, an Insured named AW was involved in automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AW's vehicle was drivable following the accident. The police report further indicated that AW was not injured and did not complain of any pain at the scene. In keeping with the fact that AW was not seriously injured, AW did not visit any hospital emergency room following the accident. To the extent that AW experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Crespo on October 29, 2020, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AW presented with problems of moderate to high severity.

(ii)    On October 2, 2020, an Insured named CS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CS's vehicle was drivable following the accident. The police report further indicated that CS was not injured and did not complain of any pain at the scene. In keeping with the fact that CS was not seriously injured, CS did not visit any hospital emergency room following the accident. To the extent that CS experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Crespo – four months after the accident, on February 16, 2021, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely

represented that CS presented with problems of moderate to high severity.

(iii) On February 1, 2021, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured and did not complain of any pain at the scene. In keeping with the fact that AG was not seriously injured, AG did not visit any hospital emergency room following the accident. To the extent that AG experienced any health issues at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Crespo – nearly nine months after the accident, on November 2, 2021, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AG presented with problems of moderate to high severity.

(iv) On August 1, 2021, an Insured named LG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LG's vehicle was drivable following the accident. The police report further indicated that LG was not injured and did not complain of any pain at the scene. In keeping with the fact that LG was not seriously injured, LG did not visit any hospital emergency room following the accident. To the extent that LG experienced any health issues at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Crespo on November 4, 2021, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that LG presented with problems of moderate to high severity.

(v) On August 16, 2021, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously

injured, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Crespo on October 5, 2021, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that CM presented with problems of moderate to high severity.

(vi)    On September 2, 2021, an Insured named SW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SW's vehicle was drivable following the accident. The police report further indicated that SW was not injured and did not complain of any pain at the scene. In keeping with the fact that SW was not seriously injured, SW did not visit any hospital emergency room following the accident. To the extent that SW experienced any health issues at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Crespo on November 4, 2021, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that SW presented with problems of moderate to high severity.

(vii)   On September 30, 2021, an Insured named LM was in involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LM's vehicle was drivable following the accident. The police report further indicated that LM was not injured and did not complain of any pain at the scene. In keeping with the fact that LM was not seriously injured, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Crespo – nearly five months after the accident, on February 15, 2022, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that LM presented with problems of moderate to high severity.

(viii)   On December 7, 2021, an Insured named DA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DA's vehicle was drivable following the incident. The police report further indicated that DA was not injured and did not complain of any pain at the scene. In keeping with the fact that DA was not seriously injured, DA did not visit any hospital emergency room following the accident. To the extent that DA experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Dano – four months after the accident, on April 1, 2022, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that DA presented with problems of moderate to high severity.

(ix)   On February 11, 2022, an Insured named PK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PK's vehicle was drivable following the accident. The police report further indicated that PK was not injured and did not complain of any pain at the scene. In keeping with the fact that PK was not seriously injured, PK did not visit any hospital emergency room following the accident. To the extent that PK experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Dano on March 28, 2022, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that PK presented with problems of moderate to high severity.

(x)   On August 13, 2022, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of low or minimal severity,

even at their onset, and improved over time. Even so, following a purported follow-up examination by Crespo – six months after the accident, on February 16, 2023, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AM presented with problems of moderate to high severity.

(xi)     On August 31, 2022, an Insured named NP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that NP's vehicle was drivable following the accident. The police report further indicated that NP was not injured and did not complain of any pain at the scene. In keeping with the fact that NP was not seriously injured, NP did not visit any hospital emergency room following the accident. To the extent that NP experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Crespo on November 22, 2022, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that NP presented with problems of moderate to high severity.

(xii)    On October 27, 2022, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured and did not complain of any pain at the scene. In keeping with the fact that LS was not seriously injured, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Crespo on January 18, 2023, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that LS presented with problems of moderate to high severity.

(xiii)   On May 8, 2023, an Insured named BR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BR's vehicle

was drivable following the accident. The police report further indicated that BR was not injured and did not complain of any pain at the scene. In keeping with the fact that BR was not seriously injured, BR did not visit any hospital emergency room following the accident. To the extent that BR experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Dano on June 16, 2023, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that BR presented with problems of moderate to high severity.

(xiv) On August 30, 2023, an Insured named KH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KH's vehicle was drivable following the accident. The police report further indicated that KH was not injured and did not complain of any pain at the scene. In keeping with the fact that KH was not seriously injured, KH did not visit any hospital emergency room following the accident. To the extent that KH experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Dano on September 29, 2023, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that KH presented with problems of moderate to high severity.

(xv) On December 1, 2023, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health issues at all as a result of the accident, they were of low or minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination by Crespo on January 25, 2024, Crespo & Associates and Crespo billed GEICO for the follow-up examination using CPT code

99214, and thereby falsely represented that JP presented with problem of moderate to high severity.

148.   These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", Crespo & Associates and Crespo routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99214, because examinations billable under CPT code 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)    Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

149.   As set forth above, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represented – among other things – that the examining physician or nurse practitioner performed at least two of the following three components during the examination: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

150.   However, in the claims for follow-up examinations identified in Exhibit "1", no physician or other health care practitioner associated with Crespo

& Associates ever took legitimate patient histories, conducted legitimate physical examinations, or engaged in legitimate medical decision-making at all.

151. Rather, following the purported follow-up examinations, the Defendants simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations, and either (ii) referred the Insureds for even more medically unnecessary Fraudulent Services, often including physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

152. In the claims for initial examinations identified in Exhibit "1", the Defendants routinely fraudulently misrepresented that the follow-up examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

    (i)    the putative follow-up examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses", and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

    (ii)    the charges for the putative follow-up examinations misrepresented the nature and extent of the examinations; and

    (iii)    Defendants never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they operated in pervasive violation of Florida law.

153.   In this context, Crespo – who at all relevant times purported to be the sole owner of Crespo & Associates – did not, and could not have, legitimately supervised the business activities of Crespo & Associates.

154.   Had Crespo actually supervised the business activities of Crespo & Associates, Crespo would have noted – among other things – that Crespo & Associate's billing falsely represented that the putative follow-up examinations were legitimately and lawfully performed.

**4.     The Fraudulent Charges for Physical Therapy Services at Crespo & Associates**

155.   In addition to the fraudulent initial and follow-up examinations, the Defendants almost always purported to subject each of the Insureds in the claims identified in Exhibit "1" to months of medically unnecessary physical therapy services.

156.   As set forth in Exhibit "1", the Defendants then billed the purported physical therapy services to GEICO under:

    (i)     CPT code 97140, for putative manual therapy, typically resulting in charges ranging from $38.40 to $177.72 for each round of manual therapy they purported to provide;

    (ii)    CPT code 97110, for putative therapeutic exercises, typically resulting in charges ranging from $96.54 and $193.08 for each round of therapeutic exercises they purported to provide;

    (iii)   CPT code 97032 for putative manual electric stimulation, typically resulting in charges ranging from $30.40 and $57.15 for each round of electric stimulation they purported to provide;

(iv)   CPT code 97035 for putative ultrasound, typically resulting in charges ranging from $38.40 and $57.15 for each round of ultrasound they purported to provide;

(v)   CPT code 97010 for putative hot/cold pack application, typically resulting in in charges of $15.00 for each round of hot/cold pack therapy they purported to provide;

(vi)   CPT code 97033 for putative iontophoresis, typically resulting in charges of $38.40 and $155.58 for each round of iontophoresis they purported to provide; and/or

(vii)   CPT code 97039 for putative unlisted physical therapy modalities, typically resulting in a charge of $22.50 for each round of unlisted physical therapy modalities they purported to provide.

157.   In the claims for physical therapy services identified in Exhibit "1" the charges for the physical therapy services were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

158.   In fact, and as set forth above, the Defendants never were eligible to collect PIP Benefits, because of their fraudulent and unlawful activities.

159.   Furthermore, the purported physical therapy services that were billed through Crespo & Associates to GEICO were unlawfully performed by massage therapists, and unlawfully billed to GEICO.

160.   What is more, in a legitimate clinical setting, the individual physical therapy services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

161. In keeping with the fact that the purported physical therapy services that were billed through Crespo & Associates to GEICO were not medically necessary, the Defendants did not tailor the physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

162. There are a large number of individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

163. However, the Defendants routinely purported to provide the same handful of physical therapy "treatments" to virtually every Insured in the claims identified in Exhibit "1", on substantially the same schedule, without regard for the Insureds' individual circumstances.

164. Specifically, Crespo & Associates, Crespo, and Dano purported to provide virtually every Insured in the claims identified in Exhibit "1" with two-to-five months of physical therapy services, consisting of manual therapy, therapeutic exercise, electric stimulation, ultrasound, and hot/cold packs. This, despite the fact that the Insureds were differently situated, and could not possibly all have required a substantially identical course of physical therapy treatment.

**5.      The Fraudulent Charges for MRIs at Crespo & Associates**

165.   What is more, the Defendants routinely purported to subject the Insureds in the claims identified in Exhibit "1" to medically unnecessary diagnostic imaging services, including MRIs.

166.   Crespo & Associates and Crespo then billed the MRIs – which were performed primarily by Crespo or Dano – through Crespo & Associates to GEICO under CPT codes 72141, 72148, and 72146, typically resulting in thousands of dollars in charges for each Insured who supposedly received the MRIs.

167.   In the claims identified in Exhibit "1", nearly all of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents.

168.   To the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as a result of their relatively minor automobile accidents, the problems virtually were always minor soft tissue injuries such as sprains, strains, and similar soft tissue injuries.

169.   In a legitimate clinical setting, MRIs should not be used as an initial form of diagnostic imaging in the treatment of patients complaining of soft tissue injuries such as sprains and strains secondary to automobile accidents.

170.   For example, the American College of Radiology – an almost 100-year-old professional organization with a mission to serve patients and society by empowering members to advance the practice, science, and professions of

radiological care – has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

171.   Along similar lines, the American College of Physicians – a more than 100-year-old professional organization with a mission to enhance the quality and effectiveness of health care by fostering excellence and professionalism in the practice of medicine – likewise has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

172.   In fact, in a legitimate clinic setting, patients suffering from soft tissue injuries such as strains or sprains secondary to automobile accidents should not receive MRIs until they receive at least four to eight weeks of conservative treatment.

173.   This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and unnecessary diagnostic imaging can be counterproductive and can even be harmful to the patient.

174.   Even so, the Defendants routinely purported to perform and/or provide medically unnecessary MRIs to Insureds as an initial form of diagnostic imaging soon after the Insureds' underlying automobile accidents. This, despite the

fact that the Insureds had not suffered any injuries that would warrant MRIs, and –

in any case – had not, and could not have, legitimately tried and failed a course of

conservative treatment at the time when the MRIs purportedly were provided.

175. For example:

(i)     On September 5, 2019, an Insured named AW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AW's vehicle was drivable following the accident. The police report further indicated that AW was not injured and did not complain of any pain at the scene. In keeping with the fact that AW was not seriously injured, AW did not visit any hospital emergency room following the accident. To the extent that AW experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates and Crespo purported to provide, and billed GEICO for, a medically unnecessary MRI of AW's cervical spine on September 17, 2019 – before AW had a chance to complete any legitimate course of conservative treatment.

(ii)    On October 2, 2020, an Insured named CS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CS's vehicle was drivable following the accident. The police report further indicated that CS was not injured and did not complain of any pain at the scene. In keeping with the fact that CS was not seriously injured, CS did not visit any hospital emergency room following the accident. To the extent that CS experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates and Crespo purported to provide, and billed GEICO for, a medically unnecessary MRI of CS's cervical spine on October 8, 2020 – before CS had a chance to complete any legitimate course of conservative treatment.

(iii)   On February 1, 2021, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated

that the accident was a low-speed, low-impact collision, and that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured and did not complain of any pain at the scene. In keeping with the fact that AG was not seriously injured, AG did not visit any hospital emergency room following the accident. To the extent that AG experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates and Crespo purported to provide, and billed GEICO for, medically unnecessary MRIs of AG's cervical and lumbar spine, and right knee on February 12, 2023 – before AG had a chance to complete any legitimate course of conservative treatment.

(iv)   On August 1, 2021, an Insured named LG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LG's vehicle was drivable following the accident. The police report further indicated that LG was not injured and did not complain of any pain at the scene. In keeping with the fact that LG was not seriously injured, LG did not visit any hospital emergency room following the accident. To the extent that LG experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates and Crespo purported to provide, and billed GEICO for, medically unnecessary MRIs of LG's cervical, thoracic, and lumbar spine on August 10, 2021 – before LG had a chance to complete any legitimate course of conservative treatment.

(v)   On August 16, 2021, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course

of conservative treatment. Even so, Crespo & Associates and Crespo purported to provide, and billed GEICO for, a medically unnecessary MRI of CM's right knee on August 23, 2021 – before CM had a chance to complete any legitimate course of conservative treatment.

(vi)     On December 7, 2021, an Insured named DA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DA's vehicle was drivable following the incident. The police report further indicated that DA was not injured and did not complain of any pain at the scene. In keeping with the fact that DA was not seriously injured, DA did not visit any hospital emergency room following the accident. To the extent that DA experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates and Crespo purported to provide, and billed GEICO for, medically unnecessary MRIs of DA's cervical and thoracic spine on January 13, 2021 – before DA had a chance to complete any legitimate course of conservative treatment.

(vii)    On February 11, 2022, an Insured named PK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PK's vehicle was drivable following the accident. The police report further indicated that PK was not injured and did not complain of any pain at the scene. In keeping with the fact that PK was not seriously injured, PK did not visit any hospital emergency room following the accident. To the extent that PK experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates and Crespo purported to provide, and billed GEICO for, medically unnecessary MRIs of PK's cervical and thoracic spine on February 18, 2022 – before PK had a chance to complete any legitimate course of conservative treatment.

(viii)   On August 31, 2022, an Insured named NP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that NP's

vehicle was drivable following the accident. The police report further indicated that NP was not injured and did not complain of any pain at the scene. In keeping with the fact that NP was not seriously injured, NP did not visit any hospital emergency room following the accident. To the extent that NP experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates, Crespo, and Dano purported to provide, and billed GEICO for, medically unnecessary MRIs of NP's cervical and thoracic spine on September 6, 2022 – before NP had a chance to complete any legitimate course of conservative treatment.

(ix)    On April 2, 2023, an Insured named FC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that FC's vehicle was drivable following the accident. The police report further indicated that FC was not injured and did not complain of any pain at the scene. In keeping with the fact that FC was not seriously injured, FC did not visit any hospital emergency room following the accident. To the extent that FC experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates, Crespo, and Dano purported to provide, and billed GEICO for, medically unnecessary MRIs of FC's cervical and lumbar spine on April 25, 2023 – before FC had a chance to complete any legitimate course of conservative treatment.

(x)     On May 8, 2023, an Insured named BR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BR's vehicle was drivable following the accident. The police report further indicated that BR was not injured and did not complain of any pain at the scene. In keeping with the fact that BR was not seriously injured, BR did not visit any hospital emergency room following the accident. To the extent that BR experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates and Crespo

purported to provide, and billed GEICO for, medically unnecessary MRIs of BR's cervical and thoracic spine on May 15, 2023 – before BR had a chance to complete any legitimate course of conservative treatment.

(xi)   On June 12, 2023, an Insured named CH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CH's vehicle was drivable following the accident. The police report further indicated that CH was not injured and did not complain of any pain at the scene. In keeping with the fact that CH was not seriously injured, CH did not visit any hospital emergency room following the accident. To the extent that CH experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates and Crespo purported to provide, and billed GEICO for, medically unnecessary MRIs of CH's lumbar spine and right knee on July 5, 2023 – before CH had a chance to complete any legitimate course of conservative treatment.

(xii)   On December 1, 2023, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates and Crespo purported to provide, and billed GEICO for, a medically unnecessary MRI of JP's lumbar spine on December 12, 2023 – before JP had a chance to complete any legitimate course of conservative treatment.

(xiii)   On January 10, 2024, an Insured named RG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RG's vehicle was drivable following the accident. The police report further

indicated that RG was not injured and did not complain of any pain at the scene. In keeping with the fact that RG was not seriously injured, RG did not visit any hospital emergency room following the accident. To the extent that RG experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates and Crespo purported to provide, and billed GEICO for, a medically unnecessary MRI of RG's lumbar spine on January 16, 2024 – before RG had a chance to complete any legitimate course of conservative treatment.

(xiv)   On February 7, 2024, an Insured named HS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HS's vehicle was drivable following the accident. The police report further indicated that HS was not injured and did not complain of any pain at the scene. In keeping with the fact that HS was not seriously injured, HS did not visit any hospital emergency room following the accident. To the extent that HS experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates and Crespo purported to provide, and billed GEICO for, medically unnecessary MRIs of HS's cervical and thoracic spine on February 20, 2024 – before HS had a chance to complete any legitimate course of conservative treatment.

(xv)   On March 6, 2024, an Insured named AP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AP's vehicle was drivable following the accident. The police report further indicated that AP was not injured and did not complain of any pain at the scene. In keeping with the fact that AP was not seriously injured, AP did not visit any hospital emergency room following the accident. To the extent that AP experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Crespo & Associates and Crespo purported to provide, and billed GEICO for, a medically unnecessary

MRI of AP's lumbar spine on March 15, 2024 – before AP had a chance to complete any legitimate course of conservative treatment.

176.   These are only representative examples. In the claims for MRIs identified in Exhibit "1", Crespo & Associates and Crespo routinely purported to perform and/or provide medically unnecessary MRIs to Insureds as an initial form of diagnostic imaging soon after the Insureds' underlying automobile accidents, despite the fact that the Insureds: (i) had not suffered any injuries that would warrant MRIs; and in any case (ii) had not, and could not have, legitimately tried and failed a course of conservative treatment.

177.   In fact, the MRIs were neither medically necessary nor lawfully provided. Instead, the MRIs were provided – to the extent that they were provided at all – pursuant to a pre-determined protocol designed to maximize the billing Crespo could submit through Crespo & Associates to GEICO and other insurers, not to treat or otherwise benefit the Insureds who were subjected to it.

178.   In this context, Crespo did not, and could not have, legitimately supervised the business activities of Crespo & Associates.

179.   Had Crespo actually supervised the business activities of Crespo & Associates, he would have noted – among other things – that Crespo & Associates routinely purported to perform medically unnecessary MRIs as a first-line diagnostic test, before an Insured had failed a legitimate course of conservative treatment.

180.   Crespo failed to do so because he never legitimately supervised the business activities of Crespo & Associates.

**6.      The Fraudulent Charges for pf-NCS Testing at Crespo & Associates**

181.   As set forth in Exhibit "1", based upon the fraudulent, pre-determined findings and diagnoses provided during the initial examinations, Crespo & Associates and Crespo purported to subject many Insureds to a series of medically unnecessary and useless pf-NCS tests.

182.   Crespo purported to perform virtually all of the pf-NCS tests at Crespo & Associates, which then were usually billed to GEICO through Crespo & Associates under CPT code 95913, which falsely represented that they provided a 13-nerve nerve conduction velocity test, when in fact they provided a medically useless pf-NCS test. These charges resulted in charges of $889.74 for each Insured on whom the pf-NCS tests purportedly were performed.

183.   Furthermore, in the claims for pf-NCS tests identified in Exhibit "1", the charges for the pf-NCS tests were fraudulent in that the charges for the pf-NCS tests misrepresented the nature of the service that supposedly was provided, and the pf-NCS tests were provided, to the extent that they were provided at all, solely in order to maximize the billing submitted through Crespo & Associates, not to treat or otherwise benefit the Insureds who purportedly were subjected to them.

**(i)      The Human Nervous System and Electrodiagnostic Testing**

184.   The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

185.   Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

186.   The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity through the body are called motor nerves.

187.   Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

188.   The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

189.  Pf-NCS tests purport to be a form of electrodiagnostic tests, and purportedly were provided by Crespo & Associates and Crespo because they were medically necessary to determine whether the Insureds had radiculopathies.

190.  The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommend policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

191.  The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

**(ii)    The Fraudulent and Medically Useless Pf-NCS Tests**

192.  The Recommended Policy does not identify pf-NCS tests as having any documented usefulness in diagnosing radiculopathies. In fact, pf-NCS tests are not recognized as having any value in the diagnosis of any medical condition.

193.  Rather, there are three primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities in

the peripheral nerves (i.e., neuropathies), which include radiculopathies. These diagnostic tests are nerve conduction velocity tests, electromyography tests, and MRIs.

194.   The pf-NCS test is a supposed non-invasive sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots. It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

195.   Pf-NCS tests are performed by administering electricity through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and/or face. The voltage amplitude is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage. Supposed "findings" then are made by comparing the minimum voltage stimulus required for the patient to announce that he or she perceives some sensation from it with purported normal ranges.

196.   In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in pf-NCS testing.

197.   If the patient's sensation threshold is greater than the purported normal range of amplitude required to evoke a sensation, it supposedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function). If the amplitude required for the patient to announce that

he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it supposedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

198.   The sensory nerves are comprised of three different kinds of nerve fibers, the A-beta fibers, the A-delta fibers, and the C fibers. The pf-NCS allegedly can diagnose the existence, nature, extent, and location of any abnormal condition in each of these specific nerve fibers by using three different frequences of electrical current. Specifically, the use of electrical currents with frequences of 5 Hz, 250 Hz, and 2000 Hz allegedly stimulate and thereby test the C-fibers, the A-fibers, and A-beta fibers, respectively.

199.   Though Crespo & Associates and Crespo purported to subject many Insureds to pf-NCS tests, supposedly to diagnose radiculopathies, the pf-NCS tests were medically useless because many Insureds who purportedly were subjected to the pf-NCS tests by Crespo & Associates and Crespo also received, shortly before and/or shortly thereafter, MRIs.

200.   Even if the pf-NCS tests purportedly provided by Crespo & Associates and Crespo had any legitimate value in the diagnosis of neuropathies, they were duplicative of the MRIs that the Insureds received and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the pf-NCS tests that Crespo & Associates and Crespo purported to provide.

201.   For example:

(i)     On September 17, 2019, Crespo & Associates and Crespo purported to provide pf-NCS tests to an Insured named AW, despite the fact that AW had already received an MRI <u>that same day</u>.

(ii)    On January 10, 2020, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named JG, despite the fact that JG had already received an MRI <u>that same day</u>.

(iii)   On February 19, 2020, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named DB, despite the fact that DB had already received two MRIs <u>that same day</u>.

(iv)    On October 8, 2020, Crespo & Associates and Crespo purported to provide pf-NCS tests to an Insured named CS, despite the fact that CS had already received an MRI <u>that same day</u>.

(v)     On June 22, 2021, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named MS, despite the fact that MS had already received an MRI <u>four days earlier</u>.

(vi)    On August 23, 2021, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named CM, despite the fact that CM had already received an MRI <u>that same day</u>.

(vii)   On December 9, 2021, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named IB, despite the fact that IB had already received two MRIs <u>that same day</u>.

(viii)  On January 17, 2022, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named DA, despite the fact that DA had already received an MRI <u>that same day</u>.

(ix)    On February 18, 2022, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named PK, despite the fact that PK had already received an MRI <u>that same day</u>.

(x)     On November 16, 2022, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named AB, despite the fact that AB had already received two MRIs <u>that same day</u>.

(xi)    On March 1, 2023, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named JQ, despite the fact that JQ had already received an MRI <u>that same day</u>.

(xii)   On May 12, 2023, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named JL, despite the fact that JL had already received two MRIs <u>that same day</u>.

(xiii)  On October 9, 2023, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named FD, despite the fact that FD had already received two MRIs <u>three days earlier</u>.

(xiv)   On January 5, 2024, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named AB, despite the fact that AB had already received an MRI <u>three days earlier</u>.

(xv)    On January 24, 2024, Crespo & Associates and Crespo purported to provide a pf-NCS test to an Insured named AI, despite the fact that AI had already received an MRI <u>that same day</u>.

202.   These are only representative examples. In the claims for putative pf-NCS testing services identified in Exhibit "1", Crespo & Associates and Crespo purported to provide the pf-NCS tests to Insureds who had already received – or would soon thereafter receive – far more specific, sensitive, and reliable MRIs.

203.   Even assuming that there was some diagnostic value for pf-NCS tests, the pf-NCS tests in these circumstances could not possibly have provided any diagnostic information of any value beyond that which was produced through MRIs.

204.   In any case, there are no legitimate data to support the use of pf-NCS tests to diagnose neuropathies in general or radiculopathies in particular.

205.   There is no reliable evidence of the existence of normal ranges of intensity or amplitude required to evoke a sensation using a pf-NCS test device. Given the lack of evidence of normal ranges of intensity required to evoke a sensation, it is impossible to determine whether any given Insured's personal pf-NCS test results are or are not abnormal.

206.   Even if there was some evidence of the existence of normal ranges of intensity required to evoke a sensation using a pf-NCS test device, there is not reliable evidence to prove that a sensation threshold greater than the normal range would indicate a hypoesthetic condition or that sensation less than the normal range would indicate a hypoesthetic condition.

207.   Even if an abnormal sensation threshold indicated either a hypoesthetic or hyperesthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from pf-NCS tests. Indeed, there are numerous pathological and physiological conditions other than peripheral nerve damage that can cause hyperesthesia and hypoesthesia.

208.   Furthermore, even if pf-NCS tests could produce any valid diagnostic information regarding the sensory nerve fibers:

(i)     there is no reliable evidence to prove that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;

(ii)    there is no reliable evidence to prove that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;

(iii)   there is no reliable evidence to prove that any such information would indicate the specific location of the abnormality along the sensory nerve pathways;

(iv)    pf-NCS do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident; and

(v)     there would be no legitimate diagnostic advantage to using pf-NCS tests to obtain information regarding the sensory nerve fibers where, as here, the pf-NCS tests were duplicative of contemporaneously-provided MRIs.

209.    In keeping with the fact that Crespo & Associates and Crespo's purported pf-NCS tests were medically useless, the Centers for Medicare and Medicaid Services ("CMS") have determined that pf-NCS tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and are therefore not compensable.

210.    In keeping with the fact that Crespo & Associates and Crespo's purported pf-NCS tests were medically useless, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for health care providers to use in describing their services for billing purposes, does not recognize a CPT code for pf-NCS tests.

211.   Moreover, in keeping with the fact that the pf-NCS tests were medically useless, the putative results of the pf-NCS testing were never incorporated into the treatment "plan" Defendants provided to Insureds at Crespo & Associates.

212.   For example:

(i)   On August 29, 2019, an Insured named SM was involved in an accident. Thereafter, on August 30, 2019, SM presented to Crespo & Associates for an initial examination by Dano. At the conclusion of the putative examination, Crespo & Associates and Dano provided SM with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that SM begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on October 4, 2019, Crespo & Associates and Crespo purported to provide SM with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into SM's supposed treatment "plan", and SM thereafter received substantially the same treatment as had been recommended to him prior to the pf-NCS testing being provided.

(ii)   On October 8, 2019, an Insured named TR was involved in an accident. Thereafter, on October 9, 2019, SM presented to Crespo & Associates for an initial examination by Dano. At the conclusion of the putative examination, Crespo & Associates and Dano provided TR with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that TR begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on October 15, 2019, Crespo & Associates and Crespo purported to provide TR with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into TR's supposed treatment "plan", and TR

thereafter received substantially the same treatment as had been recommended to her prior to the pf-NCS testing being provided.

(iii)   On November 22, 2019, an Insured named CR was involved in an accident. Thereafter, on December 19, 2019, CR presented to Crespo & Associates for an initial examination by Crespo. At the conclusion of the putative examination, Crespo & Associates and Crespo provided CR with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that CR begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on January 3, 2020, Crespo & Associates and Crespo purported to provide CR with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into CR's supposed treatment "plan", and CR thereafter received substantially the same treatment as had been recommended to her prior to the pf-NCS testing being provided.

(iv)   On February 9, 2020, an Insured named CA was involved in an accident. Thereafter, on March 12, 2020, CA presented to Crespo & Associates for an initial examination by Crespo. At the conclusion of the putative examination, Crespo & Associates and Crespo provided CA with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that CA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on February 20, 2020, Crespo & Associates and Crespo purported to provide CA with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into CA's supposed treatment "plan", and CA thereafter received substantially the same treatment as had been recommended to her prior to the pf-NCS testing being provided.

(v)   On May 20, 2020, an Insured named MH was involved in an accident. Thereafter, on May 21, 2020, MH presented to Crespo & Associates for an initial examination by Crespo. At the conclusion of the putative examination, Crespo & Associates and Crespo provided MH with substantially the same soft tissue injury "diagnoses" they provided to

virtually every Insured, and recommended that MH begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on May 29, 2020, Crespo & Associates and Crespo purported to provide MH with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into MH's supposed treatment "plan", and MH thereafter received substantially the same treatment as had been recommended to her prior to the pf-NCS testing being provided.

(vi)   On March 4, 2021, an Insured named GB was involved in an accident. Thereafter, on March 11, 2021, GB presented to Crespo & Associates for an initial examination by Crespo. At the conclusion of the putative examination, Crespo & Associates and Crespo provided GB with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that GB begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on January 3, 2020, Crespo & Associates and Crespo purported to provide GB with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into GB's supposed treatment "plan", and GB thereafter received substantially the same treatment as had been recommended to her prior to the pf-NCS testing being provided.

(vii)  On June 27, 2021, an Insured named MF was involved in an accident. Thereafter, on July 26, 2021, MF presented to Crespo & Associates for an initial examination by Crespo. At the conclusion of the putative examination, Crespo & Associates and Dano provided MF with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that MF begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on July 27, 2021, Crespo & Associates and Crespo purported to provide MF with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into MF's supposed treatment "plan", and MF thereafter received substantially

the same treatment as had been recommended to him prior to the pf-NCS testing being provided.

(viii)   On August 11, 2021, an Insured named CH was involved in an accident. Thereafter, on August 12, 2021, CH presented to Crespo & Associates for an initial examination by Crespo. At the conclusion of the putative examination, Crespo & Associates and Crespo provided CH with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that CH begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on August 17, 2021, Crespo & Associates and Crespo purported to provide CH with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into CH's supposed treatment "plan", and CH thereafter received substantially the same treatment as had been recommended to him prior to the pf-NCS testing being provided.

(ix)   On December 7, 2021, an Insured named DA was involved in an accident. Thereafter, on December 10, 2021, DA presented to Crespo & Associates for an initial examination by Dano. At the conclusion of the putative examination, Crespo & Associates, Crespo, and Dano provided DA with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that DA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on December 16, 2021, Crespo & Associates and Crespo purported to provide DA with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into DA's supposed treatment "plan", and DA thereafter received substantially the same treatment as had been recommended to him prior to the pf-NCS testing being provided.

(x)   On January 26, 2022, an Insured named JA was involved in an accident. Thereafter, on February 3, 2022, JA presented to Crespo & Associates for an initial examination by Crespo. At the conclusion of the putative examination, Crespo & Associates and Crespo provided

JA with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that JA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on June 15, 2022, Crespo & Associates and Crespo purported to provide JA with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into JA's supposed treatment "plan", and JA thereafter received substantially the same treatment as had been recommended to him prior to the pf-NCS testing being provided.

(xi)    On May 10, 2022, an Insured named MW was involved in an accident. Thereafter, on May 23, 2022, MW presented to Crespo & Associates for an initial examination by Dano. At the conclusion of the putative examination, Crespo & Associates and Dano provided MW with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that MW begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on June 6, 2022, Crespo & Associates and Crespo purported to provide MW with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into MW's treatment "plan", and MW thereafter received substantially the same treatment as had been recommended to him prior to the pf-NCS testing being provided.

(xii)   On February 8, 2023, an Insured named JQ was involved in an accident. Thereafter, on February 27, 2023, JQ presented to Crespo & Associates for an initial examination by Dano. At the conclusion of the putative examination, Crespo & Associates and Dano provided JQ with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that JQ begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on June 6, 2022, Crespo & Associates and Crespo purported to provide JQ with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never

incorporated into JQ's treatment "plan", and JQ thereafter received substantially the same treatment as had been recommended to her prior to the pf-NCS testing being provided.

(xiii)  On March 6, 2023, an Insured named HR was involved in an accident. Thereafter, on March 21, 2023, HR presented to Crespo & Associates for an initial examination by Crespo. At the conclusion of the putative examination, Crespo & Associates and Crespo provided HR with substantially the same soft tissue injury "diagnoses" they provided to virtually every other Insured, and recommended that HR begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on March 21, 2023, Crespo & Associates and Crespo purported to provide HR with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into HR's treatment "plan", and HR thereafter received substantially the same treatment as had been recommended to him prior to the pf-NCS testing being provided.

(xiv)  On August 30, 2023, an Insured named HM was involved in an accident. Thereafter, on September 11, 2023, HM presented to Crespo & Associates for an initial examination by Dano. At the conclusion of the putative examination, Crespo & Associates and Dano provided HM with substantially the same soft tissue injury "diagnoses" they provided to virtually every other Insured, and recommended that HM being substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on September 15, 2023, Crespo & Associates and Crespo purported to provide DB with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into HM's treatment "plan", and HM thereafter received substantially the same treatment as had been recommended to her prior to the pf-NCS testing being provided.

(xv)  On December 29, 2023, an Insured named AP was involved in an accident. Thereafter, on January 8, 2024, AP presented to Crespo & Associates for an initial examination by Dano. At the conclusion of the putative examination, Crespo & Associates and Dano provided AP

with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that HM being substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on January 16, 2024, Crespo & Associates and Crespo purported to provide AP with putative pf-NCS testing at Crespo & Associates. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into AP treatment "plan", and AP thereafter received substantially the same treatment as had been recommended to him prior to the pf-NCS testing being provided.

213.   These are only representative examples. In the claims for pf-NCS tests identified in Exhibit "1", Crespo & Associates and Crespo routinely falsely represented that the underlying pf-NCS tests were medically necessary, lawfully provided, and eligible for PIP reimbursement in the first instance.

214.   In fact, the pf-NCS tests were neither medically necessary nor lawfully provided. Instead, the pf-NCS tests were provided – to the extent that they were provided at all – pursuant to a pre-determined protocol designed to maximize the billing Crespo could submit through Crespo & Associates to GEICO and other insurers, not to treat or otherwise benefit the Insureds who were subjected to it.

215.   In this context, Crespo did not, and could not have, legitimately supervised the business activities of Crespo & Associates.

216.   Had Crespo actually supervised the business activities of Crespo & Associates, he would have noted – among other things – that Crespo & Associates routinely purported to perform medically useless pf-NCS tests.

217.   Crespo failed to do so because he never legitimately supervised the business activities of Crespo & Associates.

**(iii)   Each of the Two Main pf-NCS Test Device Manufacturers Claims the Other is a Fraud**

218.   Until 2004, about the same time that CMS was considering the medical benefits of pf-NCS testing before ultimately issuing its National Coverage Determination denying Medicare coverage of pf-NCS tests as medically unnecessary, the two primary manufacturers of pf-NCS testing devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

219.   Neurotron, Inc. manufactures a device called the "Neurometer". Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000". While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purports to provide quantitative data on sensory nerve conduction threshold.

220.   In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II". Notably, Neuro Diagnostic Associates, Inc.'s last known business address and telephone number is identical to that currently used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II.

221. To the extent that Crespo & Associates and Crespo actually provided any pf-NCS tests to Insureds in the first instance, they were provided using an Axon-II or re-branded Medi-Dx 7000 device.

222. Notwithstanding the Medi-Dx 7000's cosmetic re-branding as the Axon-II, Neurotron, Inc. claims that neither device produces valid data or results, and that both the Medi-Dx 7000 and Axon-II have been fraudulently marketed. For its part, Neuro Diagnostic Associates, Inc. had asserted the same claims regarding Neurotron, Inc.'s Neurometer device.

223. Among the charges made by Neurotron, Inc. against the Medi-Dx 7000 are that: (i) there is no reliable evidence that the type of electrical wave forms (asymmetrical wave forms) used by the Medi DX 7000 stimulate or provide any useful diagnostic information regarding any specific kind of sensory nerve fiber; (ii) the alternating output of electrical current used by the Medi-Dx 7000 is "severely distorted by skin impedance" (e.g., texture, thickness, temperature of the skin etc.) making it "impossible" to determine the true intensity levels of the electrical current being delivered by the Medi-Dx 7000; (iii) the Medi-Dx 7000 protocols are "incapable of measuring the thresholds in the sensory nerves"; and (iv) there are no peer-reviewed studies that validate the tests performed using the Medi-Dx 7000. These charges are all correct.

224.   Because the Axon-II is virtually identical to the Medi-Dx 7000, any and all of Neurotron, Inc.'s criticisms of the Medi-Dx 7000 would also apply to the Axon-II/Medi-DX 7000 that was used by Crespo & Associates and Crespo.

**(iv)   The Fraudulent pf-NCS "Reports"**

225.   In support of their fraudulent charges for the pf-NCS tests, Crespo & Associates and Crespo submitted pf-NCS test "reports" which falsely represented that an actual physician – Crespo – had some role in performing and interpreting the tests.

226.   Crespo & Associates and Crespo's bills for the pf-NCS tests likewise falsely represented that an actual physician – Crespo – had some role in performing and interpreting the tests.

227.   In actuality, to the extent that the pf-NCS tests were performed in the first instance, they were performed by unlicensed technicians, and Crespo had no role whatsoever in interpreting the test results.

228.   In keeping with the fact that the pf-NCS tests played no genuine role in the treatment or case of the Insureds who purportedly were subjected to them, the putative test "reports" did not contain any genuine interpretation of the test data.

229.   Instead, aside from reporting the pf-NCS data that supposedly were derived from the respective Insureds' tests, virtually all of the boilerplate pf-NCS

test "reports" contained an identical, boilerplate "Comments" section that did not vary from patient-to-patient and was included solely to foster the illusion that a licensed health care professional had some role in performing or interpreting the tests.

230.   Virtually all of Crespo & Associates and Crespo's purported pf-NCS tests reports in the pf-NCS test claims identified in Exhibit "1" contained the following, substantively identical "Comments" section, with no other interpretation of the supposed "data" derived from the tests provided at all:

> The highest rated dysfunction is the primary pathology with 95% sensitivity Ratings >+3 suggest central disc etiologies while lower ratings are more suggestive of facet syndrome

> In the absence of clear impairment contralateral discrepancy may suggest pathology. The normal variance in the cervical plexus is <20% and <30% in the lumbar plexus Calculations may be made by comparing sides at the same level using data at the bottom of this report

> In the presence of muscle weakness large motor fiber studies are warranted

> Normal findings do not rule out musculoskeletal or other neurogenic pain and paresthesia generators

> Correlation with other clinical data is advised before initiating or changing treatment

> Class III (small-pain-fiber) NCS localized the source of pain with 95% sensitivity compared to 29% sensitivity with 14.5% false positive findings using large fiber EDX Over 25% of symptoms and 38% of physical exam findings incorrectly localize pain MRI and CT Scans reveal anatomy not abnormal function/pathology

231.   Other than the boilerplate "Comments" section, which did not vary in any way from Insured to Insured, the "reports" did not contain any interpretation of the supposed data by any actual physician.

232.   The pf-NCS tests that Crespo & Associates and Crespo purported to provide were medically unnecessary, because those tests had no effect on the treatment that the Insureds received, and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, not to treat or otherwise benefit the Insureds.

233.   Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the American Association of Neuromuscular and Electrodiagnostic Medicine.

234.   Very few of the Insureds whom Crespo & Associates and Crespo purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathy.

235.   Even so, Crespo & Associates and Crespo falsely purported to use their pf-NCS tests to diagnose radiculopathies in a substantial number of the

Insureds that purportedly received pf-NCS testing at Crespo & Associates, despite the fact that pf-NCS tests cannot legitimately be used to diagnose radiculopathies.

236.   Crespo and Crespo & Associates purported to arrive at their pre-determined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the medically unnecessary Fraudulent Services provided through the Defendants.

## III.   The Fraudulent Claims the Defendant Submitted or Cause to be Submitted to GEICO

237.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through Crespo & Associates to GEICO seeking payment for the Fraudulent Services for which Defendants were not entitled to receive payment.

238.   The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented to GEICO that the Defendants were in compliance with Florida law and eligible to collect PIP Benefits in the first instance. In fact, the Defendants never were in compliance with Florida law, and never were eligible to collect PIP Benefits.

(ii)   The HCFA-1500 forms and treatment reports or caused to be submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement.

 (iii) The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary, and in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

 (iv) The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided, in order to increase the amount of reimbursement the Defendants could unlawfully obtain.

## IV. The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

239. The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

240. To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

241. The Defendants knowingly misrepresented and concealed facts related to Crespo & Associates and the Fraudulent Services in an effort to prevent discovery that Crespo & Associates was operated in violation of the Clinic Act, the

False and Fraudulent Insurance Claims Statute, the No-Fault Law, and the Physical Therapy Act.

242.   Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovery that the Fraudulent Services were unlawfully performed by massage therapists.

243.   Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

244.   For instance, the Defendants submitted facially valid HCFA-1500 forms, which purported to be signed and verified by properly licensed health care providers, in support of their fraudulent charges, and GEICO had a right to rely on this facially-valid billing.

245.   The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

246.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and

did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $3,000,000.00.

247.   Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discovery and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Crespo & Associates
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

248.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 247 above.

249.   There is an actual case in controversy between GEICO and Crespo & Associates regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

250.   Crespo & Associates has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, the No-Fault Law and the Physical Therapy Act.

251.   Crespo & Associates has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided and billed to GEICO.

252.   Crespo & Associates has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

253.   Crespo & Associates has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

254.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Crespo & Associates has no right to receive payment for any pending bills submitted to GEICO.

## <u>SECOND CAUSE OF ACTION</u>
### Against Crespo
### (Violation of RICO, 18 U.S.C. § 1962(c))

255.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 247 above.

256.   Crespo & Associates is an ongoing "enterprise," as that term is defined in 19 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

103

257.   Crespo knowingly has conducted and/or participated, directly or indirectly, in the conduct of Crespo & Associates' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Crespo & Associates was not eligible to receive under the No-Fault Law because: (i) Crespo & Associates was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

258.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

activity identified through the date of this Complaint are described, in part, in the chart attached hereto as Exhibit "1".

259.   Crespo & Associates' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Crespo operated Crespo & Associates, inasmuch as Crespo & Associates was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for Crespo & Associates to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Crespo & Associates to the present day.

260.   Crespo & Associates is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Crespo & Associates in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

261.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,000,000.00 pursuant to the fraudulent bills submitted through Crespo & Associates.

262.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Crespo**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

263.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 247 above.

264.   Crespo & Associates is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

265.   Crespo – together with the Dano, among others – knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Crespo & Associates' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Crespo & Associates was not entitled to receive under the No-Fault Laws because: (i) Crespo & Associates was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not

medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

266.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached hereto as Exhibit "1". Each such mailing was made in furtherance of the fraudulent and unlawful scheme.

267.   Crespo & Associates' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Crespo has operated Crespo & Associates, inasmuch as Crespo & Associates is not engaged in a legitimate health care practice, and acts of mail fraud therefore are essential in order for Crespo & Associates to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of

continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Crespo & Associates to the present day.

268.   Crespo & Associates is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Crespo & Associates in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

269.   Crespo knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

270.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,000,000.00 pursuant to the fraudulent bills submitted through Crespo & Associates.

271.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Crespo and Crespo & Associates
### (Common Law Fraud)

272.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 247 above.

273.   Crespo and Crespo & Associates intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Crespo & Associates for the Fraudulent Services.

274.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Defendants were in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when in fact it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

275.   The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce

GEICO to pay charges submitted through Crespo & Associates that were not reimbursable.

276.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,000,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted through Crespo & Associates.

277.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

278.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Crespo and Crespo & Associates**
**(Under Fla. Stat. § 501.201 <u>et</u>. <u>seq</u>.)**

279.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 247 above.

280.   Crespo and Crespo & Associates are actively engaged in trade and commerce in the State of Florida.

281.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

282.   Crespo and Crespo & Associates engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

283.   The claims and supporting documents submitted to GEICO in connection with the Fraudulent Services were unfair, deceptive, and unconscionable in that they misrepresented: (i) Crespo & Associates' eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

284.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of the Defendants has been materially injurious to GEICO and its Insureds.

285.   The conduct of the Defendants was the actual and proximate cause of the damages sustained by GEICO.

286.   The Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $3,000,000.00.

287.   By reason of Defendants' conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees.

**SIXTH CAUSE OF ACTION**

## Against Crespo and Crespo & Associates
### (Unjust Enrichment)

288.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 247 above.

289.   As set forth above, Crespo and Crespo & Associates have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

290.   When GEICO paid the bills and charges submitted or caused to be submitted by Crespo through Crespo & Associates, it reasonably believed that it was legally obligated to make such payments based on Crespo and Crespo & Associates' improper, unlawful, and/or unjust acts.

291.   Crespo and Crespo & Associates have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Crespo and Crespo & Associates voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

292.   Crespo and Crespo & Associates' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

293.   By reason of the above, Crespo and Crespo & Associates have been unjustly enriched in an amount to be determined at trial, but in no event less than $3,000,000.00.

## **JURY DEMAND**

294.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.   On the First Cause of Action against Crespo & Associates, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Crespo & Associates has no right to receive payment for any pending bills submitted to GEICO;

B.   On the Second Cause of Action against Crespo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.   On the Third Cause of Action against Crespo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.   On the Fourth Cause of Action against Crespo and Crespo & Associates, compensatory damages in an amount to be determined at trial but in

excess of $3,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

      E.    On the Fifth Cause of Action against Crespo and Crespo & Associates, compensatory damages in an amount to be determined at trial but in excess of $3,000,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2); and

      F.    On the Sixth Cause of Action against Crespo and Crespo & Associates, compensatory damages in an amount to be determined at trial but in excess of $3,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: October 22, 2024

*/s/ Max Gershenoff*
Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Kristen Wenger (FBN 92136)
Lindsey R. Trowell (FBN 678783)
Christina M. Bezas (FBN 1038951)
RIVKIN RADLER, LLP
Riverplace Tower
1301 Riverplace Blvd.
Suite 1000
Jacksonville, FL 32207
Phone:  (904) 791-8948
Facsimile:  (904) 598-6225
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Kristen.Wenger@rivkin.com
Lindsey.Trowell@rivkin.com
Christina.Bezas@rivkin.com
*Counsel for Plaintiffs*

114